(156 App. Div. 477.)

KETCHAM v. PROVOST et al.·

(Supreme Court, Appellate Division, First Department. May 2, 1913.)

1. PLEDGES (§ 47*)—COLLATERAL SECURITIES—RETURN—TENDER.

A pledgor of collaterals has no right without a tender or payment to demand a return thereof.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 111, 112; Dec. Dig. § 47.*]

2. PLEDGES (§§ 47, 53*)—COLLATERAL SECURITIES—RIGHTS OF PLEDGEE—ELECTION.

The holder of collaterals pledged for debt has an election to sue without regard to the collaterals on the original indebtedness, or he may apply the collateral without an attempt to collect from the original debtor; but the pledgor must dispose of the debt before he can displace the lien and recover the collateral.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 111, 112, 129–132; Dec. Dig. §§ 47, 53.*]

3. EXCHANGES (§ 7*)—STOCK EXCHANGE SEAT—PLEDGEE—SALE BY PLEDGEE.

·Since the courts cannot force the New York Stock Exchange, a voluntary private organization, to accept a purchaser of. a seat on the exchange as a member, a stock exchange seat cannot be sold by a pledgee and would only be available for the payment of a debt for which it was pledged when the stock exchange itself acted and disposed of the seat.

[Ed. Note.—For other cases, see Exchanges, Cent. Dig. §§ 8–10; Dec. Dig. § 7.*]

Dowling, J., dissenting.

Appeal from Special Term, New York County.

Suit by Suzanne B. Ketcham against George D. Provost and another. From an interlocutory judgment in favor of plaintiff in an action for an accounting and to recover certain securities, defendants appeal. Reversed, and complaint dismissed.

See, also, 147 App. Div. 777, 132 N. Y. Supp. 120.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and DOWLING, JJ.

Henry B. Ketcham, of New York City (James A. Allen, of New York City, on the brief), for appellants.

Barclay E. V. McCarty, of New York City, for respondent.

CLARKE, J. The plaintiff claimed to be the owner of the following securities, the subject-matter of this action: (1) Thirty-three $1,000 par value trust certificates of the St. Louis & San Francisco Railway Company for the common stock of the Chicago & Eastern Illinois Railroad Company; (2) one hundred shares of the preferred capital stock of the Chicago, St. Paul, Minneapolis & Omaha Railway Company; (3) forty-two $1,000 par value trust certificates of the St. Louis & San Francisco Railway Company for the common stock of the Chicago & Eastern Illinois Railroad Company; (4) one hundred shares of the common capital stock of Borden's Condensed Milk Company. The question involved is the right of the defendants, bankers and brokers, to retain possession of these securities concededly deposited with them as collateral under their claim of lien thereon.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs 1907 to date, & Rep'r Indexes

There are two separate sets of facts in this record, one pertaining to the securities known as Nos. 1 and 2 and the other to those designated as Nos. 3 and 4. All of the securities belonged to the estate of Gen. Ketcham and upon the distribution of that estate came into the ownership and possession of Charles B. Ketcham, his son.

As between Charles B. Ketcham and his wife Suzanne, the plaintiff herein, and for the purposes of this suit, we hold that, though not delivered, Mr. Ketcham gave all of said securities to his wife in May, 1907.

The defendants were bankers and brokers and Mr. Ketcham was an office associate and conducted his personal stock transactions through them.

We take up now the transactions in regard to parcels Nos. 1 and 2. On May 13, 1907, the certificate for 33 shares of St. Louis & San Francisco was returned to the company and reissued in the name of Charles B. Ketcham. At Mr. Ketcham's request the defendants had opened an account in the name of his wife, Mrs. Suzanne B. Ketcham.

June 9, 1907, Ketcham wrote to the defendants:

"I am writing to ask if you will kindly have a certified check for twenty thousand five hundred dollars drawn to Suzanne B. Ketcham and have same ready for me by 11:30 to-morrow, June 10th. I will deliver to you thirty-three Chicago & East. sec. ctfs., as agreed, for security of loan."

This check was drawn on June 10th to the order of Mrs. Ketcham, was certified, indorsed by her, and a receipt given:

"Received from Provost Brothers & Company, check $20,500 which charge to account Suzanne B. Ketcham"—signed by her.

The certificate was delivered as indicated. Mrs. Ketcham used this check in payment for a house, title to which was taken in her name, which was subsequently sold by her; she realizing therefrom upwards of $9,000, which she used. On October 23, 1907, at the time of the panic the defendants demanded additional security on this loan of $20,500. Mr. Ketcham had parcel No. 2, the certificate for 100 shares of Chicago, St. Paul, Minneapolis & Omaha, surrendered and reissued to Provost Bros. & Co. and delivered to them in response to said demand.

Mr. Provost testified that the reason for the demand was that "the Eastern Illinois certificates were not good collateral in the banks at that time." In speaking of a subsequent demand on Mr. Ketcham in 1910 when other securities were delivered, hereinafter set forth, he said:

"We did not call for further collateral for the 33 certificates and the 100 Omaha. They were amply provided with collateral for the debit balance of that account, that is, the $20,500 account was safe, that was the Suzanne B. Ketcham account."

In order to maintain her claim of delivery to the defendants of parcels 1 and 2, plaintiff asserts that her husband was acting as her agent and with her consent when he deposited said securities with the defendants. That she had knowledge of that transaction is therefore established. It follows that she is bound by his actions as her agent, with her knowledge and consent in what he did.

We thus have an account opened for her and in her name on the books of the defendants, receipt by her of a check for $20,500 as a loan, acknowledged in writing by her, secured by the deposit of said two parcels of securities as collateral. She thereafter deposited moneys in her account with defendants, in one case a check for $1,000 and in another for $4,000, drew drafts and checks thereon, received and was credited with dividends accruing upon stocks and received statements of the account, many of them upon her request, which she never questioned.

So that the learned trial court, in spite of her constant assertion in her evidence that she had no account or any indebtedness, during the trial said:

"It is perfectly evident to my mind that she had an account and received statements. I will say that for the record."

It is testified to without contradiction:

"The total debit balance, including interest to date in the Suzanne B. Ketcham account, all the charges, in other words against her, is $40,212.27, that is the total gross amount. The total credits to this account, including interest to date, is $17,694.43, leaving a net balance due to the defendants to date, $22,517.84."

Hence lots 1 and 2 had been delivered to and were held by the defendants as collateral security upon this account. We now consider lots 3 and 4. About January 27, 1910, Mr. Ketcham's debit balance on his account with the defendants amounted to $113,163.54. They had some stock that he owned outright and some bought on margin. The defendants demanded further security and there was an interview with Mr. and Mrs. Ketcham. As a result Mr. Ketcham had lots No. 3 and No. 4, which had been indorsed over to him by the executors of his father's estate, delivered to the said companies who reissued them in the name of Suzanne B. Ketcham. The transfer was consummated on February 4, 1910. On that day Mrs. Ketcham executed under seal and delivered the following instrument to the defendants:

"Gentlemen: The securities set forth having been deposited by me with you as collateral security for my account with you and also for security for the account of my husband, Charles B. Ketcham, as hereinafter stated; 42 $1,000 (par value) trust certificates of the St. Louis & San Francisco Railroad Company, for the stock of the Chicago & Eastern Illinois Railroad Company, Nos. ———, ———; 100 shares of Borden's Condensed Milk Company common certificate No. 3065. For that purpose, I do hereby sell, assign and transfer said securities and appoint ——— my true and lawful attorney, irrevocable for me and in my name and stead to sell, assign and transfer, hypothecate, pledge and take over all or any part of said securities and for that purpose to make and execute all necessary acts of assignments and transfer therefor, and to constitute one or more persons with like power, hereby ratifying all that my said attorney or his substitute or substitutes shall lawfully do by virtue thereof.

"In consideration of the extension of the payment by said Charles B. Ketcham to Provost Brothers & Company, of the balance due on his account, I agree that the securities so deposited with you shall be security for the payment to you of the balance of his account as the same now stands or may hereafter exist, provided, however, that said collateral shall not be used for that purpose until after exhaustion by you of any collateral of my husband

held by you and of the proceeds of the sale of his Stock Exchange seat. Upon the settlement of my account and of the account of my husband the aforesaid securities are to be returned to me, or accounted for."

These lots it must be conceded were thereafter held by the defendants under the terms of said instrument. By the 10th of March, 1910, the debit account of Mr. Ketcham had been reduced to $59,059.41, a liquidation of $64,000. On November 29, 1910, all of Mr. Ketcham's securities had been sold with the exception of one bond of the value of $800. At the date of the trial Mr. Ketcham's debit balance with defendants was $19,199.27 against which they held no securities other than those in suit. It is also established that the defendants have not used any of these securities to liquidate either Mr. Ketcham's or Mrs. Ketcham's indebtedness. They were all produced upon the trial. They simply held them under the claim of the lien established by her. How, then, without a settlement, without a tender of payment, can she have a return of these securities?

On the 29th of November, 1910, Mrs. Ketcham, accompanied by her father, Mr. Brightson, and her attorney, Mr. McCarty, had an interview with Mr. George D. Provost. Mr. Brightson testified:

"I expected a lawsuit and was advised one would be brought by counsel and went there for the purpose of laying a foundation for that. Mr. McCarty spoke to Mr. Provost: 'I have come here with Mrs. Ketcham, my client, to make a demand upon you for her securities or property which you hold in trust which you hold belonging to her. * * * Mrs. Ketcham claims that you hold securities belonging to her in trust and have had this property some time, receiving the interest, and she now makes a formal demand through me for that property.' Mr. Provost then said: 'That is very true, Mr. McCarty; our firm has quite a claim against Mr. and Mrs. Ketcham for money borrowed or loaned, and we will not deliver and give up those securities to her until that indebtedness is paid for both accounts.' * * * Mr. McCarty then asked Mr. Provost if he had this collateral security to protect himself against the indebtedness of Mr. and Mrs. Ketcham why he did not proceed to collect, and demanded that he should, and that if he did not he would be responsible for what would result from it or assume the responsibility."

He also testified that Mr. McCarty stated:

" 'Mr. Provost, you say you have more than enough securities to protect you against the claim of this whole estate, won't you proceed to collect?' He said he would not for the reason if he did so and sold his seat in the New York Exchange, the present value is about $80,000, he would be compelled to give him the balance of what was due him and he would without doubt start in at once and drink it up."

Mr. Provost testified:

"I did not say on that occasion, or at any other time, to Mr. Brightson or to Mr. McCarty, or to the plaintiff, or to any one else, that it was true that I held these securities, or any of them, in trust for the plaintiff. Mr. McCarty demanded the 42 bonds and the 100 Bordens, and I said, 'I hold those under the signed agreement,' as there was money due on them. He made a demand for the 33 St. Louis or the 100 Omaha preferred, and I said, 'Well, there is an indebtedness against these.' I said, 'One check for $20,500.' He said, 'May I see it?' and I said, 'Yes,' and I went and got the check and showed it to him and he handed it over to Mrs. Ketcham to verify her signature or contradict it and she acknowledged it. * * * I never at any time stated, in words or substance, to anybody, that I or my firm had more than enough securities belonging to Charles B. Ketcham to protect me or my

firm against the indebtedness claimed to be due me. * * * Q. Did you on November 29, 1910, tell Mr. McCarty or Mr. Brightson, or the plaintiff, or any one else, or did you tell either of them or any one else at any other time, that the Stock Exchange seat of Charles B. Ketcham would protect you or your firm in the indebtedness to you? A. The only thing said about that was that if the Stock Exchange seat was sold we could get our claim from the Stock Exchange seat. I guess I said that November 29th. * * * I did not state what it was worth. * * * Q. Referring to this interview at your office on November 29, 1910, * * * did Mr. McCarty or any one else then present request you, or say to you in words or substance, that you should proceed to collect the indebtedness due your firm from any property or securities or the seat of Charles B. Ketcham? A. No, they didn't make any such demand at all; nobody made any such demand; and so of course I did not refuse. * * * The demand then made upon me by or on behalf of the plaintiff was that I surrender these securities to her unconditionally. * * * Q. Referring to the interview at your office concerning which you testified, of November 29, 1910, will you state what, if anything, was said by any one in the conference respecting the sale of the seat or to set in motion the machinery looking to the suspension of Charles B. Ketcham from the New York Stock Exchange? A. We were talking about selling the seat, selling the securities there. I said to the parties, Mr. McCarty and Mr. Brightson, I said to Mr. Brightson—they were all there—'Do you want to force his failure and sell his seat?' Mr. Brightson said, 'No.' I did not hear Mrs. Ketcham say anything; she had nothing to say. She did not dissent in words from what Mr. Brightson said."

Bearing in mind that the complaint is framed in equity, upon an alleged trust relation existing between the defendants and the plaintiff, it is quite evident that the alleged demand of November 29th was for all the securities as belonging to the plaintiff; that the demand, if any, after the claim of indebtedness had been interposed by the defendants, was specific for the return of each of these lots of securities; and, in view of Brightson's testimony, "I don't think it was mentioned whether he had other securities belonging to Charles B. Ketcham," that his subsequent statement, that Mr. McCarty said if he had this collateral security to protect himself against the indebtedness of Mr. and Mrs. Ketcham why he did not proceed to collect, referred to the specific collateral claimed by the defendants; and that there was no demand that the stock exchange seat be sold.

[1, 2] I do not understand that a pledgor of collateral security has a right, without tender or payment, to demand a return of the collateral. The holder of the collateral has an election. He may sue without regard to the collateral upon the original indebtedness, or he may apply the collateral without attempt to collect from the original debtor; but in any event the election is in his hands. The pledgor must dispose of the debt before he can dispose of the lien and get back his collateral.

[3] Nor is a stock exchange seat such a collateral as may be sold by the pledgee. The way in which it could be accomplished would be to report the failure of the member to meet his obligations to the Stock Exchange, whereupon he might be suspended for a year and for such further time as the governing board in its discretion might give. The seat cannot be sold by individuals. It is not transferable like a stock or bond; membership in the exchange is the right to participate as a member in a voluntary private organization. The courts

cannot force a person upon the exchange, as has been been frequently held.

While a seat on the exchange is to a certain extent property, subject to certain conditions, which may be taxed under specific provisions of law (Matter of Hellman, 174 N. Y. 254, 66 N. E. 809, 95 Am. St. Rep. 582), the proceeds of which may pass to a trustee in bankruptcy (Page v. Edmunds, 186 U. S. 596, 23 Sup. Ct. 200, 47 L. Ed. 318), it would only be when the Stock Exchange itself acted and disposed of the seat that the proceeds thereof would become available.

I do not think that there was any direct obligation placed upon the defendants by the instrument of February 4th to institute the proceedings to procure the expulsion of Charles B. Ketcham and the ultimate sale of his seat; nor do I think that any proper demand was made upon the defendants looking to that result. The indebtedness of Charles B. Ketcham has been greatly reduced since the instrument of February 4, 1910, was given, and this reduction has been accomplished by the sale of all of his other securities which the defendants held as collateral. They retain in their possession all of the securities claimed by the plaintiff; lots 1 and 2 specifically pledged for the security of her account and lots 3 and 4 specifically pledged by her for the security of her account and her husband's. These accounts amount in the aggregate to about $44,000, and what basis she has for a suit in equity to recover the possession of such securities we fail to discover.

The judgment appealed from should be reversed, and the complaint dismissed, with costs to the appellant.

INGRAHAM, P. J., and McLAUGHLIN and LAUGHLIN, JJ., concur. DOWLING, J., dissents.